**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 10-1497**

CONTRACT MATERIALS PROCESSING, INCORPORATED,

Plaintiff – Appellant,

v.

KATALEUNA GMBH CATALYSTS; TRICAT MANAGEMENT GMBH; SUD CHEMIE
ZEOLITES GMBH, f/k/a Tricat Catalytic Products GmbH,

Defendants – Appellees.

Appeal from the United States District Court for the District of
Maryland, at Baltimore.  Andre M. Davis, District Judge.  (1:98-
cv-00147-AMD)

Argued:  October 26, 2011                Decided:  February 1, 2012

Before KING, GREGORY, and WYNN, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED**: Paul Stone Richter, RICHTER, MILLER & FINN, Washington,
D.C., for Appellant.  Barbara Susan Wahl, ARENT FOX, LLP,
Washington, D.C., for Appellees.  **ON BRIEF:** Thomas P. Miller,
RICHTER, MILLER & FINN, Washington, D.C., for Appellant.
Randall A. Brater, Karen E. Carr, ARENT FOX, LLP, Washington,
D.C., for Appellees.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

On March 30, 2010, a litigation saga spanning more than twelve years in the District of Maryland finally came to an end with the entry of a Final Order and Judgment (the "Judgment") on behalf of KataLeuna GmbH Catalysts ("KataLeuna"), Tricat Management GmbH ("TMG"), and Tricat Catalytic Products GmbH ("TCP") (collectively, the "Defendants"). The Judgment awarded $4,726,518.81 to KataLeuna on its four counterclaims against Plaintiff Contract Materials Processing, Inc. ("CMP"), net of two claims on which CMP prevailed. CMP appeals the Judgment and certain interlocutory rulings incorporated within, including that CMP pay $202,469.26 in attorney fees and interest to KataLeuna, along with discovery sanctions of $27,654.30. We affirm in all respects.

I.

CMP, principally operating out of Baltimore, was incorporated in 1987 by Dr. Edwin Albers, its president and sole shareholder, to develop chemical and petrochemical products and to provide analytical, research, and consulting services. By 1992, CMP had begun to produce and sell Fluid Cracking Catalyst ("FCC") additives, which are used in the refining process to promote the "cracking," or chemical transformation, of crude oil into lighter products such as gasoline and diesel fuel. In

2

early 1995, Dr. Albers entered into discussions with Dr. P. Kenerick Maher of Tricat Industries, Inc. ("TII"), concerning a trio of additives that CMP was developing and for which it had submitted patent applications: (1) "$SO_x$ A," designed to reduce sulfur emissions from the refining process; (2) "Combustion Promoter B," a cobalt-based version of Mobil's platinum-based progenitor, intended to facilitate the combustion of carbon monoxide into $CO_2$; and (3) "Octane Enhancer B."

TII was the American parent and sole shareholder of TMG, a German holding company managed by Maher. In May 1995, TMG acquired 74.8% of KataLeuna, with the remaining 25.2% retained by the Bundesanstalt für vereinigungsbedingte Sonderaufgabe ("BvS"), a governmental agency overseeing the privatization of former East German enterprises. Maher's negotiations with Dr. Albers resulted in the execution of a Sales Agency Agreement ("SAA") and a Research and Development Agreement ("RDA") between CMP and KataLeuna, and of a Technology Transfer Agreement ("TTA") among the same corporate entities, Dr. Albers, and J. Gary McDaniel, a key CMP employee familiar with its FCC operations.

Under the terms of the TTA, effective November 27, 1995, CMP agreed to transfer to KataLeuna its "entire right, title and interest" in the additives. In return, KataLeuna agreed to pay $2.1 million, transfer five thousand shares of non-voting TII

3

stock (having a stipulated value of $75,000), and remit royalties to CMP amounting to 20% of KataLeuna's gross margin realized from the manufacture and sale of the FCC additives, up to a maximum of $7.6 million. KataLeuna had long been in the catalyst business, and its acquisition of the FCC additive technology developed by CMP was part of a plan to expand its product line, another component being the construction of a new manufacturing and processing plant in Leuna, Germany. The TTA included the warranties of CMP and the individual signatories that KataLeuna could rely on any statements in the patent applications, that the technology had not been patented and violated no existing patents, that the reports previously delivered to KataLeuna "demonstrating the viability and the reliability of the Combustion Promoter B" technology were "true, complete and correct," and that the technology was "new, useful and unobvious." J.A. 98-99.[1]

The TTA also provided for the transfer of McDaniel's employment from CMP to KataLeuna, and it required the delivery of the fully executed RDA, whereby Dr. Albers would devote approximately one-third of his time for one year to further test and develop the FCC additives in order to perfect and expand

---

[1] Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties to this appeal.

4

their uses.  In exchange, KataLeuna agreed to pay CMP $400,000 in equal quarterly installments.  The SAA, predating both the RDA and the TTA, appointed CMP as KataLeuna's exclusive North American agent for the sale of smaller quantities of zeolites (absorbent minerals used in the catalytic process).  CMP agreed thereunder to store and sell KataLeuna's zeolites on consignment in exchange for a commission on net sales; to defray CMP's sales and marketing expenses, KataLeuna covenanted to pay CMP $240,000 annually in equal monthly installments.

In October 1996, notwithstanding the efforts of Dr. Albers to perfect $SO_x$ A, it became obvious to KataLeuna that the compound was not working as the parties had anticipated.  The hoped-for chemical synergy between the hydrotalcite and zinc titanate components had not developed, owing to the relative ineffectiveness of the latter.  The outcome was consistent with tests performed in 1994 on prior versions of the compound by Dr. Raghubir Gupta of the Research Triangle Institute.  Dr. Gupta, who conducted the testing at the request of Dr. Albers, had been skeptical of the compound's efficacy from the outset, given the chemical reality that particles useful for removing hydrogen sulfide are generally ineffective to also remove sulfur dioxide.  According to Dr. Gupta, it was "very, very well-known that zinc oxide is an excellent $H_2S$ removal.  So from common sense normally it will not work for $SO_2$ removal."  J.A. 1806.

5

CMP had also conducted preliminary testing on Combustion Promoter B, with inconclusive results. Another test was run in late 1996 after KataLeuna had taken ownership, but, absent full saturation of the cobalt-based compound in the FCC unit, i.e., complete displacement of the platinum-based promoter, it could not be conclusively determined whether CMP's invention was effective. McDaniel was optimistic, in that the processing temperature had remained fairly steady throughout, but the owners of the unit were so unimpressed that they purchased no more of the compound. Then, at a full-saturation test in August 1997, after Mobil's promoter had to be reintroduced to the unit to control rapidly rising temperatures, it became apparent that Combustion Promoter B was generally ineffective. Scientific testing by a Dutch catalyst manufacturer in August 1999 confirmed that conclusion.

Octane Enhancer B was similarly a bust. KataLeuna prosecuted the patent application that had been transferred to it pursuant to the TTA, but the United States Patent and Trademark Office rejected it on the ground that the additive was virtually identical to a pre-existing South African patent. Both compounds were based upon a blend of synthetic zeolites with natural clinoptilolite, and each was designated for use in a hydrocarbon cracking process.

The parties' business association thus turned out to be short-lived. KataLeuna opted to not renew the RDA, withholding the final quarterly installment of $100,000. KataLeuna also notified CMP that the SAA would be terminated at the end of November 1996. The zeolites remained with CMP until late August 2005, when KataLeuna removed some and abandoned the rest. CMP, whose lease on the storage area was expiring, disposed of the remaining materials. No royalty payments, contemplated by the TTA to begin on February 1, 1998, were ever made.

On January 15, 1998, prior to the date of performance with respect to the royalty payments, CMP filed suit in the District of Maryland against KataLeuna and TMG. The Complaint alleged breaches of payments due under the RDA and SAA, and it anticipatorily sought a declaratory judgment as to the parties' rights and responsibilities under the TTA. Issues regarding proper service resulted in the filing of the operative Amended Complaint on December 9, 1998, which retained the RDA and SAA breach claims (Counts I and II); substituted a claim (Count IV) under the TTA for the former declaratory judgment count; amended a separate SAA claim (Count III) to assert entitlement to compensation for bailment of the stored zeolites; and added claims (Counts V and VI) for misappropriation and conversion, respectively, of trade secrets relating to CMP's FCC additives technology. The Amended Complaint named a third Defendant, TCP,

7

which had been created in 1997 to establish KataLeuna's former research division, Triadd, as a formal business entity. Counts VII through X alleged that TMG was responsible for the acts of KataLeuna outlined in Counts I-III, and independently liable for conversion, misappropriation, and breach of the TTA. The latter three allegations were essentially repeated against TCP in Counts XI through XIII. CMP demanded a jury trial on all claims.

The Defendants answered and counterclaimed on April 16, 1999. By its operative Second Amended Counterclaim, KataLeuna asserted breaches of the three agreements (Counts I-III) and alleged in the alternative (Counts IV-VI) that CMP was unjustly enriched. According to KataLeuna, CMP did not live up to its warranties in the TTA and ignored its obligations under the RDA and SAA. KataLeuna also maintained that CMP had converted the consigned zeolites (Count VII), negligently exposed them to the elements (Count VIII), and failed to remit sales proceeds as agreed in the SAA (Count IX). Finally, KataLeuna requested an accounting as to chemicals it transferred to CMP, and as to FCC additives that CMP sold to third parties (Count X).

The district court dismissed CMP's conversion claims as to the additives technology (Counts VI, IX, and XIII) on August 11, 1999. Thereafter, on September 18, 2001, the court granted summary judgment to TMG and TCP as to the remaining claims

8

against them (Counts VII, VIII, X, XI, and XII), and to KataLeuna on the claims for breach of the TTA (Count IV) and for misappropriation (Count V), leaving only CMP's claims for breach of the RDA and SAA (Counts I and II) and for bailment (Count III). On the counterclaim side of the ledger, the district court awarded summary judgment to KataLeuna for $18,507.40, the undisputed amount owed by CMP for the sale of zeolites (Count IX). In a proposed joint pretrial order submitted to the court on August 28, 2002, KataLeuna abandoned its claims for unjust enrichment (Counts IV-VI).

With most of CMP's case being dismissed or summarily adjudicated against it, the district court was of the opinion that the portion of the counterclaim relating to the TTA (Count I) dominated the remaining issues. The court thus decided to bifurcate that count for a bench trial on KataLeuna's assertion that it was entitled to equitable rescission, putting aside for the time-being the parties' competing legal claims under the RDA and SAA (CMP's Counts I-II, and KataLeuna's Counts II-III), along with those arising from the storage and safekeeping of the consigned zeolites (CMP's Count III and KataLeuna's Counts VII-VIII). As the result of that twelve-day bench trial, the evidentiary portion of which was conducted over scattered dates in the winter and spring of 2003, the district court, on September 28, 2003, entered a Rule 54(b) judgment rescinding the

9

TTA, awarding restitution of $2,793,449.13 to KataLeuna for "equitable damages . . . intertwined with its remedy of rescission," J.A. 2712, and ordering CMP and KataLeuna to return, respectively, the TII stock and the technology properties.[2] The judgment awarded an additional $134,945 to KataLeuna for attorney fees incurred in defending the misappropriation claims. CMP proceeded to file an interlocutory appeal, which we declined to certify and therefore dismissed. See Order, Contract Materials Processing, Inc. v. Tricat Mgmt. GmbH, No. 03-2253 (4th Cir. Mar. 10, 2005) (unpublished).

The case languished on remand until CMP moved for the district court's recusal on September 28, 2006, citing in part the litigation delay and other grounds, but based primarily on the court's service in 2003-05 as a member of the Board of Directors of the Foundation for Research on Economics and the Environment ("FREE"). FREE's activities as a nonprofit entity are substantially underwritten by corporate subsidies, including donations from Shell Oil Co., which, since 1998, has been an indirect corporate parent of KataLeuna. Following a hearing on June 14, 2007, the court declined to recuse itself. In the

---

[2] Rule 54 permits a district court to "direct entry of a final judgment as to one or more, but fewer than all, claims or parties," on condition that "the court expressly determines that there is no just reason for delay." Fed. R. Civ. P. 54(b).

10

interim, on January 24, 2007, CMP petitioned for mandamus relief to compel recusal, which we summarily denied. <u>See</u> Order, <u>In re: Contract Materials Processing, Inc.</u>, No. 07-1059 (4th Cir. Feb. 16, 2007) (unpublished).

At the June 14 hearing, the district judge revealed that he had resigned from the Board of FREE following his receipt of an undisclosed letter opinion on the matter from the Committee on Codes of Conduct, an authorized body of the Judicial Conference of the United States. CMP again sought the court's recusal through a second petition for a writ of mandamus filed on July 13, 2007, requesting disclosure of the letter. We again denied relief via a short-form order. <u>See</u> Order, <u>In re: Contract Materials Processing, Inc.</u>, No. 07-1657 (4th Cir. Oct. 2, 2007) (unpublished).

On April 28, 2008, KataLeuna tendered a Rule 68 offer of judgment to CMP on the latter's claims for breach of the RDA and of the SAA (Counts I and II), agreeing to pay the damages demanded in the pleadings, plus interest and costs, to be offset against any judgment in its favor on the counterclaim, Counts II and III of which (pertaining to KataLeuna's claims against CMP under the RDA and SAA) would be dismissed with prejudice. CMP refused the offer, but, on October 30, 2008, the district court nonetheless granted KataLeuna's motion to dismiss Counts I and II of the Amended Complaint for mootness. The dismissal order

also encompassed Counts II and III of the Second Amended Counterclaim. CMP sought immediate review of the district court's order through a third mandamus petition and a separate notice of appeal, neither of which were successful. See Order, In re: Contract Materials Processing, Inc., No. 08-2246 (4th Cir. Dec. 16, 2008) (unpublished) (denying petition for writ); Order, Contract Materials Processing, Inc. v. KataLeuna GmbH Catalysts, No. 08-2311 (4th Cir. Feb. 9, 2009) (unpublished) (dismissing appeal as interlocutory).

The parties submitted an amended proposed pretrial order on November 19, 2009, in which KataLeuna abandoned its claim for an accounting of proceeds from the sale by CMP of certain chemicals and additives (Count X). That paved the way, after almost twelve years of litigation, for a jury trial solely on the claims emanating from the consigned zeolites, relating to Count III of the Amended Complaint and Counts VII and VIII of the Second Amended Counterclaim. The trial commenced on December 7, 2009, with the court granting judgment as a matter of law to KataLeuna on CMP's claim for bailment at the close of the latter's case-in-chief. At the conclusion of trial, the jury returned a verdict for KataLeuna on its claims for conversion and negligence in the amount of $571,389.25, plus prejudgment interest. The district court entered its final judgment against CMP on March 30, 2010, as follows:

12

```
  2,793,449.13     (TTA equitable damages)
+ 1,732,091.53     (interest from 10/5/99)
  4,525,540.66
    571,389.25     (zeolites conversion/negligence)
+     8,452.51     (interest from 11/14/05)
  5,105,382.42
+    18,507.40     (zeolites consignment sales)
  5,123,889.82
   (181,021.37)    (KataLeuna breach of RDA, plus interest)
+  (216,349.64)    (KataLeuna breach of SAA, plus interest)
$ 4,726,518.81
```

The district court entered a final net judgment in KataLeuna's favor of $4,726,518.81, supplementing interlocutory awards to KataLeuna of $202,469.26 in attorney fees and interest, together with discovery sanctions of $27,654.30. On appeal, CMP asserts that the proceedings below were infected throughout with error. For clarity's sake, we address in chronological order the specific instances giving rise to these assertions.

## II.

### A.

Shortly after the filing of the Amended Complaint, the Defendants sought to dismiss CMP's claims for misappropriation and conversion. The district court granted dismissal of the conversion claims, concluding that CMP's assignment through the TTA of the entirety of its interest in the FCC additives deprived it of any entitlement to possess them, an essential element of the tort. The court, however, "[i]n light of the

13

liberal spirit pervading the pleading requirements," declined to dismiss the misappropriation claims. J.A. 158. In so ruling, the court recognized that CMP had not alleged "that Kataleuna initially obtained the technology improperly," but had instead maintained that, through subsequent transfers, one or more of the other Defendants had "improperly procured [its] use . . . in order to circumvent Kataleuna's responsibility to pay CMP royalty payments." Id. at 159.

The misappropriation claims were thus among those permitted to proceed to discovery. In developing the discovery plan, counsel for CMP became informed that TII had hired John McCauley in April 1996 to coordinate with McDaniel in specifying and controlling the research that CMP and Dr. Albers were to conduct under the RDA. McCauley's assigned station was a lab in a trailer at CMP, where he worked through October 1996. CMP speculated that McCauley was a potential conduit for the flow of proprietary information that enabled KataLeuna to further its fledgling FCC additives business by developing patentable advances from the TTA technology and, perhaps, other CMP discoveries. Proceeding on that theory, CMP requested at the outset of the litigation "documents concerning . . . any FCC additive," J.A. 199, and "patent prosecution files . . . for all patent applications related to [the TTA patents] or any related non-U.S. patent applications." Id. at 201. The defendants

14

objected on trade secret and other grounds, in particular that "documents concerning technology other than the [TTA technology] are irrelevant." Id. at 213.

Some of the contested documents were accidentally produced, relating to six patent applications that KataLeuna was then pursuing, including one for $SO_x$ B, a magnesium oxide variation of the zinc oxide-based $SO_x$ A technology. CMP argued for the production of additional materials based on its assertion that the inadvertently disclosed documents revealed that some of the new applications were "continuation" applications, that some were attributable to McCauley's efforts, and that some incorporated work product, such as testing results, produced by CMP pursuant to the RDA. Indeed, it seems that some of these applications contained graphs with plot points derived from a proprietary CMP procedure, which the company evidently perfected while developing the additives that were the subject of the TTA.

Although the threshold for relevance is not a high one, i.e., "information . . . reasonably calculated to lead to the discovery of admissible evidence," Fed. R. Civ. P. 26(b)(1), the district court, at the December 16, 1999 hearing on CMP's motion to compel, called the company's attempts at discovery "promiscuous," J.A. 351, making it plain that the court was not going to convert its "extraordinarily generous" denial of KataLeuna's threshold motion to dismiss the misappropriation

15

claims "into some dragon of a discovery machine and thereby open up all kinds of lines of inquiry that simply are not likely to lead anywhere fertile." Id. at 380. After hearing from both sides, the court declared that it was "not persuaded" by CMP's arguments that the requested materials were germane. Id. at 401.

A district court's discovery rulings are reviewed for abuse of discretion. See Carefirst of Md., Inc. v. Carefirst Pregnancy Centers, Inc., 334 F.3d 390, 396 (4th Cir. 2003). In denying CMP's motion to compel, some of the court's remarks may have rankled ("This is exactly the kind of thing, with all respect, sir, that people point to when they talk about discovery abuse."), J.A. 352, but the undercurrent motivating them is readily understood: the relatively discrete claims that survived dismissal had, with discovery scarcely begun, been transformed into something much broader.

Worse, the transformation had no legal basis. A claim under Maryland law for the misappropriation of business information is governed by the state's adoption of the Uniform Trade Secrets Act ("UTSA"), which requires, among other things, that the information be "acquired by improper means." Md. Code. Ann. Com. Law § 11-1201(c)(1). To the extent that KataLeuna may have used the CMP technology to facilitate its fledgling catalyst business, it was not barred from doing so by the TTA,

16

which merely required KataLeuna to pay royalties to CMP on sales of the specific additives that were the subject of that agreement; consistently therewith, the RDA imposed an obligation of confidentiality solely on CMP, with no similar restriction on KataLeuna. Consequently, the information that CMP sought was not reasonably calculated to lead to the discovery of admissible evidence, and the district court did not abuse its discretion by declining to compel the Defendants to produce it.

Hewing more closely to the misappropriation claims as conceived in its pleadings, CMP pursued information concerning the April 1997 decision to transfer TMG's majority interest in KataLeuna to BvS, the minority owner. The arrangement as proposed would have assigned KataLeuna's rights to the FCC additives to TCP, contrary to an alleged oral understanding between Maher and Dr. Albers. That deal never materialized, however. Instead, by virtue of a series of agreements executed in the summer of 1998 among multiple parties, TMG indeed divested its interest in KataLeuna, but the latter retained the rights and obligations set forth in the TTA.

CMP sought to discover these "Summer 1998 Agreements," but not all of them were provided, and some that were provided were heavily redacted. With the assistance of the court, KataLeuna agreed to produce less-redacted versions. The matter appeared to have been resolved, except for some complaints from CMP at a

17

hearing to dismiss KataLeuna's counterclaims, see J.A. 562-63, and a couple of objections at the subsequent bench trial on rescission, see id. at 1796-97, 1912-14, that the documentation evidencing the transfer was unclear or incomplete. Absent more proactive efforts from CMP to bring their complaints to the attention of the court prior to the hearing or trial, however, we are unable to ascertain any abuse of discretion.

B.

The misappropriation claims ultimately failed at the summary judgment stage, as CMP could show no impropriety or misuse in that KataLeuna legitimately acquired all rights to the FCC additives, and there was no evidence adduced of a subsequent transfer in violation of the supposed oral agreement. In addition, the district court noted a dearth of evidence supporting the proposition that the technology had actually been maintained with sufficient secrecy to qualify as a "trade secret" under the UTSA. See Md. Code. Ann. Com. Law § 11-1201(e)(2) (defining term in part as information that "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy"). The court thereafter granted a petition for attorney fees of $134,945 incurred in defending the claims, finding that KataLeuna, TMG, and TCP had "carried the burden imposed upon them by Maryland law, frankly by a very large margin, to show clearly and convincingly that CMP

18

initiated and maintained its trade secrets claims in bad faith." J.A. 1459.

A court may award attorney fees under the UTSA if a party initiates or pursues in bad faith a claim for misappropriation of trade secrets. See Md. Code. Ann. Com. Law § 11-1204(1); Optic Graphics, Inc. v. Agee, 591 A.2d 578, 588 (Md. Ct. Spec. App. 1991). Generally, an award of fees lies within the trial court's discretion. See Deadwyler v. Volkswagen of Am., Inc., 884 F.2d 779, 784 (4th Cir. 1989).

The district court here concluded that the misappropriation claims were "alleged and maintained in objective speciousness," J.A. 1478 (footnote omitted), and it further referred to CMP's approach to discovery (multiple unsuccessful motions to compel, coupled with deposition notices and a non-party subpoena being quashed for "reckless extravagance") as evidence of its subjective ill will. Insofar as the court's ruling is plausible in view of the facts and the law, it was not an abuse of discretion. CMP complains that the court awarded fees without convening an evidentiary hearing, but our precedent counsels that due process is satisfied so long as the court has familiarized itself with the relevant facts by becoming immersed in the underlying proceedings. See In re Kunstler, 914 F.2d 505, 521 (4th Cir. 1990). Such was undoubtedly the case here.

19

The district court also granted summary judgment to KataLeuna on CMP's claim for breach of the TTA. CMP insists the court's ruling was in error, pointing to a single page from a July 15, 1997 report by KataLeuna's auditor, translated from the German, stating that the TTA "was rescinded effective January 1, 1997." J.A. 1119. The court excluded the report excerpt as hearsay, but CMP contends that the statement is a party admission, see Fed. R. Evid. 801(d)(2), in that the auditor may properly be considered an agent of KataLeuna.

Assuming, for the sake of argument, that the auditor was KataLeuna's agent and that the excerpt accurately reflected his understanding with respect to the TTA, its potential admissibility under a hearsay exception is beside the point in that the statement utterly lacks probative value. To suggest that KataLeuna attempted a unilateral rescission of the TTA is contrary to any reasonable view of the case and its surrounding context. Following the initial exchange of rights for money, KataLeuna's only substantive obligation under the TTA was to pay CMP if and when it sold the FCC additives. Having not sold any additives, KataLeuna paid no royalties to CMP; it did not have to "rescind" anything. KataLeuna did seek rescission as a remedy once it had been sued, but that particular action in no way meets the legal definition of "breach."

Wrapped up in this issue, as with the misappropriation claims, is CMP's assertion that, prior to the execution of the TTA, Maher and Dr. Albers reached an oral agreement that KataLeuna would not further transfer the FCC additive rights until the royalty payments topped out at $7.6 million. Maryland law governs the contract, with the result that "[t]he parol[] evidence rule only applies where the parties to a written contract agree or intend that the writing shall be their whole agreement." State Dep't of Gen. Servs. v. Cherry Hill Sand & Gravel Co., 443 A.2d 628, 631 (Md. Ct. Spec. App. 1982) (citations omitted). Inasmuch as there is no merger or integration clause in the TTA, it is at least arguable that Maher's alleged assurances to Dr. Albers could be part of the parties' agreement, at least to the extent that non-transferability is not flatly inconsistent with CMP's written assignment of its "entire right, title and interest." Again, however, there is no evidence that KataLeuna actually transferred the rights to the additives. The district court therefore appropriately awarded summary judgment to KataLeuna on CMP's claim for breach.

III.

A.

KataLeuna countered CMP's claims of breach with similar allegations of its own, asserting entitlement to alternative remedies. In late 2002 or early 2003, as the parties were preparing for trial, KataLeuna elected to pursue rescission, forgoing its pursuit of legal damages and abandoning its claims for unjust enrichment. Rescission is an equitable proceeding, see Griggs v. E.I. duPont de Nemours & Co., 385 F.3d 440, 447 & n.4 (4th Cir. 2004), among those that fall outside the constitutional right to trial by jury of "suits at common law." U.S. Const. amend. VII; see Tull v. United States, 481 U.S. 412, 417 (1987) (citations omitted).

Nonetheless, the right to a jury trial for claims at law is "preserved to the parties inviolate," Fed. R. Civ. P. 38(a), and "only in the most imperative circumstances . . . can the right to a jury trial of legal issues be lost through prior determination of equitable claims." Dairy Queen, Inc. v. Wood, 369 U.S. 469, 472-73 & n.7 (1962) (quoting Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 510-11 (1959)). Thus, "where legal and equitable claims are contained in the same set of facts, the right to a jury trial, which the legal claims permit, should predominate." Ritter v. Mount St. Mary's College, 814 F.2d 986,

22

990 (4th Cir. 1987); accord, Terry v. Chauffers, Teamsters and Helpers Local 391, 863 F.2d 334, 336 (4th Cir. 1988).

Ritter, however, proved an exception to the rule. In that case, the district court erroneously dismissed the plaintiff's legal claims and conducted a bench trial on an equitable claim; after the legal claims were reinstated on appeal, the question arose as to whether the bench trial findings were precluded from relitigation before the jury. The district court ruled in the affirmative, and we agreed, relying on the Supreme Court's decision in Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322 (1979), arising on similar facts, for the proposition that "the harm complained of is insufficient to override the judicial interest in the speedy resolution of disputes." Ritter, 814 F.2d at 991.

Plainly, "mixed" cases in which rescission is invoked as a potential remedy pose a problem for the district courts in case administration. One approach to the problem is to employ a method whereby "the jury first decides the questions of fact and then the judge decides whether rescission is an appropriate remedy." Falco v. Alpha Affiliates, Inc., No. 97-494, 2000 WL 727116 (D. Del. Feb. 9, 2000) (unpublished) (citing precedent that substantial non-performance justifying rescission is a question for the trier of fact, and noting that "many, but not all, of the alleged facts underlying the equitable counterclaim

23

are the same as that underlying the counterclaims triable to the jury"); cf. Terry, 863 F.2d at 339 ("Resolution of the declaratory relief demand, however, raises legal issues that may well require both a determination by the court of the meaning of the collective bargaining agreement and a resolution by the jury of disputed facts concerning whether that agreement was breached.").

It is arguably a different situation where the legal and equitable claims arise on separate facts, such as in Dollar Sys., Inc. v. Avcar Leasing Sys., Inc., 890 F.2d 165 (9th Cir. 1989), in which the court of appeals upheld the district court's decision to conduct a bench trial on the defendants' counterclaim for rescission, prior to impaneling a jury to decide the remaining legal claims. The Ninth Circuit acknowledged the rule of Dairy Queen, but observed that "[t]he legal and equitable claims asserted in this action . . . do not involve any common questions of law or fact." Id. at 170. In such a situation, "the order of trial is immaterial, and may be left in the discretion of the court." Id. at 171 (quoting 9 C. Wright & A. Miller, Federal Practice and Procedure § 2305, at 35 (1971)); accord, Arber v. Essex Wire Corp., 490 F.2d 414, 421-24 (6th Cir. 1974) (finding no violation of Seventh Amendment where federal claim potentially implicating right to jury trial was

24

dismissed and rescission subsequently elected as to remaining state law claim).

The parties dispute whether KataLeuna's equitable counterclaim seeking rescission of the TTA is truly independent of CMP's indisputably legal claims for damages under the RDA and SAA. It is certainly the case that the RDA is one of several documents referred to in the TTA whose execution and delivery was a condition of closing. It is also true that one purpose of the RDA was "to further develop [the TTA] technology," J.A. 106, together with new additives technologies. That the FCC additives were apparently subject to additional testing and refinement, however, has scant bearing on whether CMP lived up to its representations in the TTA that the technology was useful, reliable, and patentable, and very little to do with CMP's specific claim of non-payment under the RDA. Thus, the facts underlying this appeal are analogous to those described by the Ninth Circuit in Avcar, and a similar result should arguably obtain. More to the point, however, any error occasioned by the bifurcation in this matter was harmless, inasmuch as CMP recovered fully on its claims under the RDA and SAA.

B.

KataLeuna's claim under the TTA thus proceeded to trial before the district court, sitting without a jury. Among the witnesses were Christopher Rosenthal and Arthur Steiner.

25

Rosenthal was KataLeuna's damages expert.  Following Rosenthal's brief testimony, CMP declined the court's invitation to cross-examine, explaining that "[w]e're going to call him during our defense case."  J.A. 1756.  KataLeuna objected, and the court reserved ruling, although it opined "That's not the way it's done."  Id. at 1759.  CMP employed the same tactic with Steiner, who had testified on behalf of KataLeuna as an expert on patents, and also as a fact witness on KataLeuna's attempt to obtain certain patents.  KataLeuna again objected, and the court again deferred its ruling:   "You know my feelings about the whole question of CMP's recalling certain witnesses . . . . [Counsel] will have to make a very detailed proffer . . . before I permit him to recall any witness."  Id. at 1811-12.

When the time came for the proffer, counsel explained that CMP wanted to question Rosenthal on his damages calculation being premised on a legal breach theory, rather than an equitable rescission theory, to inquire as to some late revisions to his report, and "to ask him about some defects that are in his methodology and in his analyses."  J.A. 1817.  With respect to Steiner, CMP proposed to examine him regarding patent applications for $SO_x$ B and combustion promoters submitted by KataLeuna that, according to CMP, had been based upon the FCC additives technology.  The district court denied recall of both witnesses, ruling that the proffer as to Rosenthal would have

26

been the proper subject of cross-examination, and the proffer as to Steiner was foreclosed in reaffirmation of the court's prior rulings on the misappropriation claims. Proffered testimony from Dr. Albers as to the patent sources was also excluded.

We review evidentiary rulings to ensure that the district court did not abuse its discretion. See United States v. Blake, 571 F.3d 331, 350 (4th Cir. 2009) (citation omitted). The trial court is afforded wide latitude in the conduct of proceedings and presentation of evidence, and, in this instance, it gave counsel ample and timely warning that CMP might be precluded from eliciting evidence from hostile witnesses in the manner it apparently preferred. Under the circumstances, the court appears to have acted well within its sound discretion in conforming its rulings to its warnings.

Apart from the foregoing procedural dispute, CMP maintains that the district court substantively erred in adjudging KataLeuna entitled to rescission. CMP contends that the court's conclusion flouts a number of legal prerequisites to equitable relief, specifically that: (1) the parties could not be restored to their respective positions prior to the TTA, because KataLeuna sold the additives technology to TCP; (2) KataLeuna failed to tender all the benefits it received under the TTA; (3) KataLeuna had an adequate remedy at law for damages; (4) the

election of remedy came too late and was thus barred by laches; and (5) CMP's breach of the TTA, if any, was not material.

These contentions merit little discussion. The record is clear that although KataLeuna contemplated a transfer of the additives technology, it actually retained those rights throughout. Moreover, the supposed benefits KataLeuna failed to tender (the profits purportedly realized from the transfer that did not happen, together with allegedly derivative $SO_x$ B and copper palladium combustion promoter patents) likewise find no record support for their existence. Indeed, McCauley testified at deposition, without contradiction, "that he learned nothing from CMP." J.A. 392.

Although a minority of jurisdictions adhere to the traditional rule that rescission is contingent upon damages at law proving inadequate, Maryland affords the innocent party the right to rescission whenever "there has been a material breach of a contract." Washington Homes, Inc. v. Interstate Land Dev. Co., 382 A.2d 555, 563 (Md. 1978). The right to elect rescission can be waived if not elected within a reasonable time following discovery of the breach and the breaching party suffers prejudice from the delay, see Benjamin v. Erk, 771 A.2d 1106, 1120 (Md. Ct. Spec. App. 2001), but the district court specifically found that KataLeuna did not reasonably discover that all the TTA technologies were without value until well

28

after litigation had commenced. See J.A. 2704. And, notwithstanding CMP's insistence that the TTA cannot be properly understood independently of the RDA's contemplation that the additive technologies were subject to further development, it seems plain that the essence of CMP's obligations under the TTA was that something worth developing was being transferred. The district court's judgment of rescission, being supported by the facts and governing law, was therefore proper.

IV.

As previously noted, we dismissed as premature CMP's appeal of the Rule 54(b) order entering judgment for KataLeuna on its counterclaim for rescission. About eighteen months afterward, Dr. Albers filed a sworn declaration pursuant to 28 U.S.C. § 144, seeking the district court's recusal.[3] The declaration accused the court of intentionally delaying the proceedings on remand, and it set forth Dr. Albers's belief that the court had "not been impartial in this case as a result of [its] association with FREE or [its] identification with the

_____

[3] The statute provides, in pertinent part, that if a party to any proceeding before the district court devises and submits "a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceedings." 28 U.S.C. § 144.

substantial contributors to that private foundation." J.A. 4083. According to Dr. Albers, partiality was manifest in the court's rulings against CMP and in its statement on remand that it would not reconsider any matter previously decided.

A district court has the discretion to entertain the possibility of recusal, and its exercise of discretion in favor of remaining on the matter is reviewed for abuse. See Newport News Holdings Corp. v. Virtual City Vision, Inc., 650 F.3d 423, 432 (4th Cir. 2011). At the outset, we may decline KataLeuna's invitation to invoke res judicata on its assertion that our denial of mandamus relief decided the issue. Mandamus is, of course, an extraordinary remedy to which the petitioner need show a clear entitlement. See In re Beard, 811 F.2d 818, 826 (4th Cir. 1987) (noting that "mandamus will not issue when all that is shown is that the district court abused its discretion in making the challenged ruling"). Our review would therefore have been more deferential than it is now, on appeal of the final order.

Under any standard, however, it was hardly incumbent upon the district court to disqualify itself. To begin with, "the bias or prejudice which can be urged against a judge must be based upon something other than rulings in the case." Berger v. United States, 255 U.S. 22, 31 (1921). A properly sworn § 144 affidavit accompanied by the certificate of counsel that it is

being filed in good faith, upon being acknowledged by the court as legally sufficient, is enough to require recusal of the presiding judge.   The affidavit, however, must "show the objectionable inclination or disposition of the judge, which we have said is an essential condition."   Id. at 35.   Mere intimations of prejudice or bias founded on the court's association with a nonprofit entity receiving indeterminate funding by a remote parent of a corporate litigant fall short of the required showing.

In Berger, the affidavit was filed on information and belief by defendants in a 1918 espionage prosecution, three of whom were of German or Austrian descent.   The defendants' averments related certain remarks attributed to the trial judge, Kenesaw Mountain Landis, in a different proceeding.   According to the defendants, Judge Landis premised his remarks by boasting, "If anybody has said anything worse about the Germans than I have I would like to know it so I can us[e] it."   255 U.S. at 28.   Judge Landis went on to opine that "[o]ne must have a very judicial mind, indeed, not to be prejudiced against German-Americans in this country."   Id.   He continued:

> Their hearts are reeking with disloyalty . . . .   This same kind of excuse of the defendant offering to protect the German people is the same kind of excuse offered by the pacifists in this country, who are against the United States and have the interests of the enemy at heart by defending that thing they call the Kaiser and his darling people . . . .   I know a

31

safe-blower . . . who is making a good soldier in France. He was a bank robber for nine years, that was his business in peace time, and now he is a good soldier, and as between him and this defendant, I prefer the safeblower.

Id. at 28-29. Needless to say, Judge Landis's purported statements were far more illuminative of his state of mind in that case than the circumstances alleged here to reveal the district court's supposed bias in favor of KataLeuna. Cf. Davis v. Bd. of Sch. Comm'rs of Mobile Cnty., 517 F.2d 1044, 1050 (5th Cir. 1975) (concluding that trial judge did not abuse his discretion by refusing to disqualify himself in response to "peremptory challenge type approach [that] would bid fair to decimate the bench. Lawyers, once in controversy with a judge, would have a license under which the judge would serve at their will.").

Though we by no means insinuate that a section 144 affiant need produce evidence of a trial judge's bias or prejudice to the degree attributed to Judge Landis in Berger, Dr. Albers's declarations in this matter fall far short of the evidentiary critical mass necessary to compel the conclusion that the district court should have recused itself. That being the situation, we can discern no abuse of discretion in the court's decision to remain on the case.

32

V.

A.

The matter of the court's recusal having been resolved for the time-being by our denial of extraordinary relief, the parties moved inexorably toward their final trial. The issues to be tried narrowed considerably upon the district court's approval of KataLeuna's offer of judgment to CMP for the former's breach of the RDA and SAA. Federal Rule of Civil Procedure 68 provides that "a party defending against a claim may serve on an opposing party an offer to allow judgment on specified terms, with the costs then accrued." Fed. R. Civ. P. 68(a). If the offer is accepted, then the clerk must enter judgment consistent with the agreed terms, but "[a]n unaccepted offer is considered withdrawn," and the defendant's subsequent costs are subject to being paid by the plaintiff in the event that the eventual judgment obtained is less favorable than the defendant's offer. Fed. R. Civ. P. 68(b), (d).

The rule undoubtedly contemplates an offer in the nature of a compromise, but in this case KataLeuna tendered full judgment in offset, including prejudgment interest and costs, as to Counts I and II of CMP's Amended Complaint. Despite CMP's purported rejection of the offer, the district court essentially forced its acceptance by ruling that it no longer had subject

33

matter jurisdiction over the claims because their satisfaction had mooted the underlying case or controversy.

Our precedent supports the court's ruling. In Zimmerman v. Bell, 800 F.2d 386, 390 (4th Cir. 1986), a putative class action, we affirmed the district court's dismissal of the plaintiff's individual claims following the defendants' offer of judgment in full. We observed that in light of the offer, "there was no longer any case or controversy. . . . [The plaintiff's] personal stake in the outcome had disappeared, and federal courts do not sit simply to bestow vindication in a vacuum." Id.

CMP counters, citing Bevier v. Blue Cross & Blue Shield of S.C., 337 Fed. App'x 357 (4th Cir. 2009) (per curiam) (unpublished), in which we rejected the plaintiff's contention on appeal that his acceptance of the defendant's Rule 68 offer of a money judgment failed to extinguish his right to pursue permanent injunctive relief on the same claim. According to CMP, the circumscribed context evident in Bevier permits consideration of a broader proposition that a court may not invoke an offer of judgment to dismiss particular claims in a multiple-claim proceeding.

In so arguing, CMP conflates the dismissal of individual "claims" in a lawsuit (which is clearly permitted by the text of the rule), with the dismissal of the gamut of potential

34

"remedies" associated with a claim (which is all that <u>Bevier</u> had occasion to address). CMP insists that the RDA and SAA issues overlap the rest of the case, and it was therefore error to remove the consideration of those claims from the jury, but for the reasons previously discussed with respect to the bifurcation of KataLeuna's claim for rescission of the TTA, the court did not abuse its discretion in the conduct of the proceedings.

B.

In preparing for the jury trial on the claims involving the consigned zeolites, KataLeuna noticed depositions of Dr. Albers and his son-in-law, Kurt Kroger, the latter being a lawyer who had assumed responsibility for winding up CMP's business affairs. Although CMP had, throughout the litigation, accepted and produced witnesses pursuant to the identical notice templates, counsel in these instances (in conjunction with local counsel for Dr. Albers in Florida, and with counsel for Kroger in California) advised their clients not to attend the scheduled depositions because, in counsel's estimation, the notices were technically defective for not including the witnesses' local addresses. Thereafter, CMP's counsel refused all proffered dates to reschedule the deposition of Kroger (whom his firm did not represent), and did not relent until KataLeuna filed a motion to compel. After the depositions were conducted, the district court denied KataLeuna's motion as moot.

35

In addition to the deposition shenanigans, CMP failed to produce a videotape that KataLeuna specifically requested, one in which Kroger detailed KataLeuna's cleanup and removal of the zeolites. At first, CMP disavowed the video's existence and denied that such a thing had ever been commissioned; six months later, CMP acknowledged possession of the tape but produced only a redacted copy, asserting the attorney-client and work-product privileges in its formation.

Upon finding all the foregoing, the district court awarded KataLeuna $27,654.30 in attorney fees. Where a party "fails to obey an order to provide or permit discovery," sanctions may include paying "the reasonable expenses, including attorney's fees" attributable to the failure. Fed. R. Civ. P. 37(b)(2)(A), -(C). CMP points out that it disobeyed no specific order pursuant to a motion to compel, but that position misapprehends the proper meaning of the word "order" in the rule. CMP's actions contravened the general order of the district court authorizing discovery, see J.A. 3211, and it was therefore within the court's discretion to award sanctions. See Deadwyler v. Volkswagen of Am., Inc., 884 F.2d 779, 784 (4th Cir. 1989) (reciting abuse-of-discretion standard).

## C.

A jury was impaneled to decide whether KataLeuna was liable in bailment to reimburse CMP for the cost of keeping the

consigned zeolites on the latter's property for nearly ten years prior to their removal, and whether CMP was liable in conversion or negligence for permitting the exposed materials to degrade by moving them outside its warehouse. Under the SAA, CMP was entitled to a percentage of net sales of the zeolites, plus $20,000 per month "[i]n support of [its] sales and Marketing expenses." J.A. 89.

CMP took the position that $6,000 of the monthly charge for expenses was allocated for storage, based on an alleged conversation among McDaniel (on behalf of KataLeuna) and Dr. Albers and his son (on behalf of CMP), following termination of the SAA, during which CMP offered to continue to house the zeolites for that price. Prior to trial, the district court excluded evidence of that particular conversation and, more generally (based on the parol evidence rule and the SAA integration clause), evidence of any negotiations concerning the execution of the SAA or attempted oral modification afterward.

The court explained that, in light of CMP's failure to respond to specific discovery inquiries regarding damages (including the non-disclosure prior to the hearing of any conversation involving McDaniel and the Alberses), it was stuck with Dr. Albers's 1999 deposition testimony that the standard annual storage fee in the area was "probably around $6 a square

37

foot." J.A. 3639-40, 3810.[4] The court rejected CMP's arguments that KataLeuna should have phrased its discovery requests differently or moved to compel more specific answers. See id. at 3866.

During the trial, the district court sustained objections to questions concerning the substance of post-termination conversations between Dr. Albers and McDaniel, to questions regarding similar conversations between Dr. Albers's son and other KataLeuna representatives, and to CMP reading into the record a letter whereby KataLeuna's counsel referred to the zeolites as "consigned." See J.A. 3871-74, 3901-06, 4010. All that was presented to the jury with respect to CMP's claim for bailment was KataLeuna's recitation, for impeachment purposes, of Dr. Albers's conclusory testimony at deposition that CMP was seeking $6,000 per month as storage compensation. There was no evidence of any written agreement between the parties establishing a bailment at a particular rate, nor of any written demand or invoice supporting an inference that KataLeuna had acquiesced to CMP's terms. Dr. Albers was not even asked to

---

[4] Based on the uncontested representations of KataLeuna's counsel that the zeolites had been stored in approximately 1,600 square feet of space, CMP's claim would have been for only about $800 per month.

38

repeat his deposition testimony that the fair market value for storage was $6 per square foot.

At the end of CMP's case-in-chief, the district court granted KataLeuna's judgment as a matter of law on CMP's bailment claim, ruling that no reasonable jury could conclude that KataLeuna was legally obligated to CMP. Moreover, the lack of evidence on damages, according to the court, would have required the jury to engage in impermissible speculation as to their proper measure. See J.A. 3937-39.

The rules plainly specify that "[i]f a party fails to provide information or identify a witness . . . , the party is not allowed to use that information or witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). It is therefore difficult to see how the district court abused its discretion in excluding CMP's late proffer. The court was also correct, in light of the resultant lack of proof, to enter judgment as a matter of law for KataLeuna on CMP's bailment claim.

VI.

Pursuant to the foregoing, the judgment of the district court is affirmed.

AFFIRMED

39